**LAW OFFICE OF SAM A. SCHMIDT**
115 BROADWAY Suite 1704
NEW YORK, N.Y.  10006
(212) 346-4666
FACSIMILE (212) 566-1068
Email lawschmidt@aol.com

**Sam A. Schmidt, Esq.**
_____
**Danielle Corbett, Paralegal**

May 10, 2018

Honorable John G. Koeltl
United States District Court Judge
500 Pearl Street
New York, NY 10007

Re: United States v. LaQuan Williams
17 Cr. 402 (JGK)

Dear Judge Koeltl:

    This letter is submitted on behalf of LaQuan Williams to assist your Honor in the determination of the appropriate sentence for Mr. Williams.  I have also attached letters from Mr. Williams, his wife Tawanna Williams, his cousin Natasha Jean, his brother Arnold Faulkner, his sister Megan Faulkner, his friend Julissa Bartholomew, and Joshua Bryant of the National Fatherhood Initiative. Exhibit A.[1]

    LaQuan Williams has expressed his remorse and desire to change his life in his letter to your Honor.  He understands that your Honor has the right to be wary and suspicious of such declarations of remorse and the promise that this is the last time he will get into trouble because of his prior record of similar offenses . It is, however, a necessary start.

    LaQuan Williams is very much aware that his difficult childhood is not an excuse for his criminal activity. However, his childhood, including his learning

---

[1] I included a typed copy of Mr. Williams handwritten letter for your Honor's convenience.

1

**LAW OFFICE OF SAM A. SCHMIDT**

**Sentencing Letter to Hon. John G. Koeltl**   *United States v. LaQuan Williams*
**May 10, 2018**                                  **17 Cr. 402 (JGK)**

difficulties, do explain his failure to complete high school and the few opportunities he had as a young adult. His strong relationships and bonds with his family and friends, as expressed in the submitted letters, not only demonstrates the better side of Mr. Williams, it also provides the hope and expectation that he is capable of turning his life around and becoming a productive member of our community.

Both Mr. Williams' parents were in and out of prison. His mother first went to prison when Mr. Williams was just eight (8) years old. Her criminal activity was for fraud and identity theft. Though it was not preordained that Mr. Williams would become a criminal specializing in fraud and identity theft, it is not a surprise. Being raised in East New York, a special education student with no real help at home and being teased made it difficult for him to succeed in school. *See* letters of Ms. Jean and Ms. Williams. Nevertheless, the letters show the generosity and kindness that Mr. Williams showed towards others. *See* letters of Tawanna Williams, Natasha Jean and Joshua Bryant. LaQuan Williams was and still is dedicated to helping his partially paralyzed brother Arnold Faulkner. When he had resources, whether legitimately or illegitimately earned, he was generous to not only to his family but to strangers in need. See e.g Tawanna Williams letter.

LaQuan Williams knows that it is he that who has the responsibility to do something to increase his opportunities in the future. He has taken the limited opportunities available in State prison and hopes to complete his GED while in federal custody.[2] *See* PSR ¶¶ 135-137. He does have skills as a barber and can

---

[2] A recent article in the New York Times exposes the present difficulties in seeking to improve opportunities once released from prison.

> They're not going to talk to you about this," said Joe Rojas, a teacher at the federal prison complex in Coleman, Fla. He said the Justice Department could not answer those questions without acknowledging that the Trump administration had cut more than 6,000 prison jobs.

> Staffing is so short that teachers around the country are regularly reassigned to cover

**LAW OFFICE OF SAM A. SCHMIDT**

| | |
|---|---|
| **Sentencing Letter to Hon. John G. Koeltl** | *United States v. LaQuan Williams* |
| May 10, 2018 | 17 Cr. 402 (JGK) |

begin earning money legitimately while he gains additional marketable skills. *See* PSR ¶ 135. Additionally, his friends have offered him other employment opportunities upon his release. *See* letters of Julissa Bartholomew, Joshua Bryant. Mr. Williams also hopes to enter the substance abuse program to overcome his dependence on alcohol. *See* PSR § 134.

**General Deterrence**

General deterrence is regularly cited by the government in its request for a sentence within the Guidelines. In a recent New Jersey case, a state that uses language similar to 18 U.S.C. 3553(a) for its sentencing determinations, the court noted that "deterrence incorporates two 'interrelated but distinguishable concepts,' the sentence's 'general deterrent effect on the public [and] its personal deterrent effect on the defendant.[cites omitted]. In the absence of a finding of a need for specific deterrence, general deterrence 'has relatively insignificant penal value.'" *State v Fuentes* 217 N.J.57 (2014).

Research supports the view of the New Jersey courts. "That notion [that others will be less likely to commit similar crimes if this defendant is made an example of what happens to wrongdoers] is just that – a notion. It is not supported by research. *See e.g.*, Michael Tonry, Purposes and Functions of Sentencing, 34

---

routine guard duties, he said.

One of the White House priorities is to offer incentives to encourage inmates to enroll in programs to prepare them for life outside prison. Mr. Rojas and others are quick to note that incentives are not the problem: Educational programs are so popular that more than 15,000 federal inmates are on waiting lists for high school equivalency diploma and literacy programs, according to a 2016 Justice Department report.

"It sounds pretty on paper," said Mr. Rojas, who is the president of his American Federation of Government Employees union local. "But when you cut staff, you can't do anything." March 28, 2018 and https://www.nytimes.com/2018/03/28/us/politics/jeff-sessions-jared-kushner-prisons.html

**LAW OFFICE OF SAM A. SCHMIDT**

| | |
|---|---|
| **Sentencing Letter to Hon. John G. Koeltl** | *United States v. LaQuan Williams* |
| **May 10, 2018** | **17 Cr. 402 (JGK)** |

Crime and Justice: A Review of Research 1, at 28-29 (2006) (University of Chicago Press). Studies have found no difference between the deterrent effects of probationary and prison sentences. *See* David Weisburd, et al., Specific Deterrence in a Sample of Offenders Convicted of White-Collar Crimes, 33 Criminology 587 (1995) n. 11.

The Department of Justice itself recognizes the lack of general deterrence

> [s]ending an offender to prison isn't a very effective way to deter crime. Prisons are good for punishing criminals and keeping them off the street, but prison sentences are unlikely to deter future crime. Prisons actually may have the opposite effect: Inmates learn more effective crime strategies from each other, and time spent in prison may desensitize many to the threat of future imprisonment.

"FIVE THINGS ABOUT DETERRENCE http://nij.gov/five-things/pages/ deterrence.aspx.

**Credit Pretrial Detention on for October 21, 2015 in Brooklyn - PSR ¶ 112.**

On October 21, 2015, Mr. Williams and co-defendant Rosario were arrested in Brooklyn in possession of counterfeit checks and stolen debit card. *See* Gov't Sentencing Letter for Rosario Dkt. No. 57. The offenses of conviction include the time period between September 2015 and January 2016. Thus, the offense that resulted in Mr. Williams' arrest in October 2015 is part of the offense conduct. *See also* PSR ¶ 112. After his arrest in Florida on January 21, 2016 and extradition to New York, he remained in custody on the Brooklyn case until he pleaded guilty to a reduced charge of Disorderly Conduct and sentenced to a Conditional Discharge on July 13, 2016, a total of 173 days. Eight days later, his parole was revoked and remained in custody as a result of the revocation of parole for an additional 315 days until May 31, 2017 when he was paroled into the custody of federal authorities for the instant case. Thus, the 173 days of incarceration was not credited towards his October 21, 2015 Brooklyn case nor any other case.

**LAW OFFICE OF SAM A. SCHMIDT**

**Sentencing Letter to Hon. John G. Koeltl**   *United States v. LaQuan Williams*
**May 10, 2018**                                 **17 Cr. 402 (JGK)**

Because the 173 days were not credited towards the Brooklyn case, these circumstances do not comfortably fall within any of the Guideline sections, commentary or examples except, perhaps in the background paragraph found at the end of USSG § 5G1.3 that reiterates the district court's discretion and the need to consider the factors listed in 18 USC § 3553(a).

**The Consideration of the Current Period of Incarcerated Since His Arrest and the Determination of How Much More Time is Required.**

Prior to his arrest in Florida on January 21, 2016 for the criminal conduct involved in this case, Mr. Williams escaped significant punishment for his criminal conduct. He served sentences of six months in 2007 and eight months for his 2010 and 2011 cases.[3] Unfortunately, escaping significant punishment did not have the appropriate impact on him to change his ways. The last twenty-six (26) months he has spent in jail, fortunately, has been made a very real impression on LaQuan Williams. And Mr. Williams expects to spend more time in jail before he can start his life anew. That Mr. Williams deserves greater punishment than before is not disputed. The question is how many more years must he remain incarcerated to satisfy the requirements of 18 U.S.C. § 3553(a) is the question before your Honor.

If Mr. Williams is given a Guideline sentence and credited for the 173 days served for the same conduct in the Brooklyn case and the more than ten (10) months in pretrial detention in this case, he will need to serve an additional sixty-five (65) months. That will mean he would have been in jail for a total of ninety-one (91) months since his arrest in January, 2016. We submit that requiring Mr. Williams to spend that much time in jail is more than necessary to achieve the goals of 18 USC 3553(a).

---

[3] For the nine months sentence in 2007 he would have served no more than six months. For his three to six years concurrent sentences he was released after eight months after doing the Shock Incarceration Program.

5

**LAW OFFICE OF SAM A. SCHMIDT**

**Sentencing Letter to Hon. John G. Koeltl**   *United States v. LaQuan Williams*
**May 10, 2018**                                 **17 Cr. 402 (JGK)**

The consideration of the length of the previous sentences is a significant factor in resolving the issue of what sentence is "sufficient but not greater than necessary to" satisfy the need for adequate deterrence, the protection of the public and to provide just punishment. Even prior to *United States v. Booker*, 543 U.S. 220, 125 S. Ct. 738 (2005) and the cases that followed, downward departures were available for those facing the severe penalties as a result of being classified as a career offender. *United States v. Mishoe*, 241 F.3d 214, 219 (2d Cir. 2001). Under the post Booker sentencing regime, as your Honor is aware, there is far greater discretion in determining the appropriateness of a for an individual defendant. Thus, the factors that the court in *Mishoe* thought relevant in its determination is of equal or greater importance today when determining whether a sentence of such length is necessary. One of those factors are the sentences previously imposed on the defendant.

Another factor to consider is the overcrowding and lack of resources available to inmates to obtain "the needed educational or vocational training ... in the most effective manner." 18 U.S.C. 3553(a)(2)(D). *See* footnote 1, *supra.*

We submit that serving four years in jail since his incarceration in January, 2016 is sufficient but not greater than necessary in this case. Since Mr. Williams will receive credit for the ten (10) months he has been held in pretrial detention, a sentence of thirty-four (34) months, twenty-four months on Count Two to serve consecutively to eight (8) months on Count One will achieve that goal.[4]

---

[4] After the completion of some programs, an inmate may be transferred to a halfway house six months prior to the expiration of his term, ninety (90) or sixty (60) days before was more common. Unfortunately "[t]he administration of President Donald Trump has been quietly cutting support for halfway houses for federal prisoners, severing contracts with as many as 16 facilities in recent months, prompting concern that some inmates are being forced to stay behind bars longer than necessary."
https://www.reuters.com/article/us-usa-justice-prisons-exclusive/exclusive-trump-administration-reduces-support-for-prisoner-halfway-houses-idUSKBN1CI2ZA

**LAW OFFICE OF SAM A. SCHMIDT**

**Sentencing Letter to Hon. John G. Koeltl**     *United States v. LaQuan Williams*
**May 10, 2018**                                   17 Cr. 402 (JGK)

**Pretrial Conditions of Confinement**

While the deteriorating conditions in MDC apply to most inmates housed a t MCC, some have suffered more.[5] Mr. Williams has developed a fungal skin condition that has not been properly treated.  The effect of this condition ranges from simple discomfort to pain and an inability to sleep. Hopefully, the condition will be better treated in his designated facility.

**Objections to the PSR**

We have no objections to the presentence report.

**CONCLUSION**

Distribution of narcotics is a serious offense.  This submission is not meant to diminish the seriousness of the offense.  It is meant to persuade your Honor that substantially less further incarceration than recommended is necessary to achieve the goals of 18 U.S.C. § 3553(a) for such lengthy continued incarceration serves no societal nor personal function in this case.

It would be a rare circumstance for a defendant to come before your Honor to be sentenced after a plea of guilty without expressions of remorse and sorrow. Some are certainly heartfelt, others are not. Many who are not sincere may put on a good show.  Some who are sincere do not know how to express themselves to demonstrate their sincerity.  Mr. Williams has tried his best to express himself to your Honor.

> My name is LaQuan Williams. I'm thirty-three years old.
> Throughout my life I've had various run-ins with the law and have

---

[5] The MCC has had numerous sanitary issues that have been either unresolved or had temporary fixes. Since the MCC is a pretrial detention center and houses every type of inmate, there is fewer hours of visitation and recreation available.

7

**LAW OFFICE OF SAM A. SCHMIDT**

**Sentencing Letter to Hon. John G. Koeltl**    *United States v. LaQuan Williams*
**May 10, 2018**                                 **17 Cr. 402 (JGK)**

> been fortunate not to have spent much time in jail for those run-ins. I have been in jail for the last 25 months, which is 4 times longer than my longest incarceration. I've done a lot of reflecting and soul searching and realized that if I didn't view my life in a different manner, I will be basically throwing my life down the drain and by no means do I ever want to be viewed in that light...
>
> One thing that I will never forget is the guideline chart, and I can honestly say that just looking at it placed a terrible feeling in my heart which is a very scary feeling for me where I don't want to do any type of fraud or crime anymore. I know you might have heard it before, but there will not be another time for me.
>
> This has been an eye opening experience which I will never forget and will use as my guide to stay on the narrow path to be a productive member of society.

Letter of LaQuan Williams.

    It is respectfully submitted that continued incarceration of LaQuan Williams will not serve the purposes of the sentencing principles under 18 U.S.C. § 3553(a).

        Respectfully submitted,

        /s/

        Sam A. Schmidt